IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| SUSAN ROSE MITCHELL, | ) | Case No. 1:19-cv-1401 |
| | ) | |
| Plaintiff, | ) | JUDGE SOLOMON OLIVER, JR. |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | **REPORT & RECOMMENDATION** |
| Defendant. | ) | |

## I.    Introduction

Plaintiff, Susan Rose Mitchell, seeks judicial review of the final decision of the Commissioner of Social Security, denying her applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act.  This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b).  Because the Administrative Law Judge ("ALJ") failed to apply proper legal standards and build an adequate and logical bridge between the evidence and the result when he failed to consider – or even indicate whether he considered – Mitchell's bipolar disorder in assessing her residual functional capacity ("RFC"), I recommend that the Commissioner's final decision denying Mitchell's applications for SSI and DIB be VACATED and that Mitchell's case be REMANDED for further consideration.

## II.    Procedural History

On October 14, 2016, Mitchell applied for DIB and SSI.  (Tr. 214-39).[1]  Mitchell alleged that she became disabled on January 1, 2012, due to low back pain, PTSD, and depression.  (Tr. 64, 80).  She later amended her alleged onset date to October 14, 2016.  (Tr. 249).  The Social Security Administration denied Mitchell's applications initially and upon reconsideration.  (Tr. 63-125).  Mitchell requested an administrative hearing.  (Tr. 157-60).  ALJ William Leland heard Mitchell's case on November 14, 2018, and denied the claims in a July 25, 2018, decision.  (Tr. 12-62).  On April 22, 2019, the Appeals Council denied further review, rendering the ALJ's decision the final decision of the Commissioner.  (Tr. 1-6).  On June 18, 2019, Mitchell filed a complaint to seek judicial review of the Commissioner's decision.  ECF Doc. 1.

## III.    Evidence

### A.    Relevant Medical Evidence

#### 1.    Physical[2]

From March 14, 2012, through June 7, 2016, Javier Alvarez-Tostado, MD, treated Mitchell for chronic back and leg pain.  (Tr. 343-44-53, 358, 366-82, 387, 390-91, 397-98, 926-28).  Dr. Alvarez-Tostado noted that x-rays showed well-maintained vertebral bodies and disc heights and treated Mitchell's leg pain and varicose veins with a combination of compression therapy and sclerotherapy.  (Tr. 343-44-53, 358, 366-82, 387, 390-91, 397-98, 926-28).  In July 2015, Mitchell indicated that her legs felt better, although she continued to have some back and leg pain.  (Tr. 368).

---

[1] The administrative transcript is in ECF Doc. 10.
[2] The court is providing a minimal summary of Mitchell's physical treatment records, because the majority of them significantly pre-date Mitchell's alleged onset date of October 14, 2016, and because the parties' chief dispute relates to the handling of Mitchell's bipolar diagnosis.

From May 14, 2012, through December 19, 2013, Mitchell saw Edwin Capulong, MD, for her back pain.  (Tr. 406-07, 418-30, 438-40).  During his examinations, Dr. Capulong found that Mitchell had no scoliosis, no kyphosis, no focal atrophy, no gait problems, full strength in her extremities, mild tenderness in her spine, pain on thoracolumbar rotation.  (Tr. 406-07, 421, 439-40).  He diagnosed Mitchell with lumbar spondylosis and myofascial pain, and treated her with Lyrica, Neurontin, tramadol, medial branch block injections.  (Tr. 407, 418, 428).  Dr. Capulong also referred Mitchell to physical therapy, which she "failed" after attending three sessions without improvement.  (Tr. 430, 440); *see also* (Tr. 430-36) (physical therapy notes indicating, *inter alia*, that Mitchell had fair posture and recommending that she engage in a home exercise program).

On July 3, 2014, Mitchell told her primary care physician, Kevin Bogar, MD, for treatment of chronic headaches and back pain, and she noted that she took lorazepam, Buspar, and Prozac for anxiety .  (Tr. 398-400).  Dr. Bogar gave Mitchell medications and recommended moist heat treatment, home exercise, weight loss, and improved posture to help her back pain.  (Tr. 400).

On October 21, 2014, Mitchell saw Harpreet Singh, MD, for a pain management evaluation after a September 11, 2014, referral from Lisa Echeverry, CNP.  (Tr. 392); *see also* (Tr. 395-97) (Nurse Echeverry's notes showing that Mitchell reported "almost complete relief" of her back pain with Neurontin and finding that Mitchell had a bulging lumbar disc).  Mitchell reported that sitting and medication helped, but her pain interfered with her physical activities and sleep.  (Tr. 392).  Based on a 2012 MRI, Dr. Singh determined that Mitchell had only "minimal" bulging discs and some facet atrophy in her lumbar spine, but she was otherwise normal and there were no acute findings.  (Tr. 392-93.  On examination, Mitchell had a full range of motion without pain in her extremities, full strength, normal gait, and no problems with

coordination, reflexes, or sensation.  (Tr. 394).  Dr. Singh referred Mitchell for an aqua therapy consultation and an MRI, continued her tramadol prescription, and increased her Neurontin prescription.  (Tr. 394).  Dr. Singh also prescribed Vitamin D and recommended she ask her psychiatrist to add Effexor, noting that she had reported panic attacks and depression and appeared depressed at the appointment.  (Tr. 394).

On December 3, 2014, Mitchell told Samuel Samuel, MD, that she had aches and pains, especially in her lower back.  (Tr. 388-89).  Dr. Samuel found that Mitchell's MRI results were mild, but she had tenderness in fibromyalgia tender points on examination.  (Tr. 389).  Dr. Samuel diagnosed Mitchell with myalgia/myositis, fibromyalgia, and possible lumbar degenerative disc disease; indicated that he would consider a bursa injection; ordered a follow-up MRI; and prescribed Lyrica.  (Tr. 389).  On January 28, 2015, Mitchell reported some improvement with Lyrica, and Dr. Samuel noted that her MRI was normal with some mild stenosis and facet arthritis.  (Tr. 385-86).  Dr. Samuel treated Mitchell with a medial branch block on February 9, 2015, and an epidural steroid injection on March 9, 2015; however, Mitchell said she only had temporary relief from the medial branch block.  (Tr. 376, 379-80, 383).  Dr. Samuel performed medial branch radiofrequency ablations on Mitchell's lumbar spine on May 18 and June 15, 2015.  (Tr. 369, 372).

On September 17, 2015, Mitchell told Dalbir Singh, PA, that she continued to have back pain (8 out of 10 in severity), and that radiofrequency ablation did not help.  (Tr. 363-64).  Examination showed that Mitchell had normal strength in her extremities, no atrophy, and an antalgic gait.  (Tr. 364).  Sing diagnosed Mitchell with vertebral disc degeneration and prescribed vitamin D and Topamax.  (Tr. 364).

On November 24, 2015, Marina Tudico, PA, and Dr. Teresa Ruch, MD, evaluated Mitchell for neurosurgery after a September 18, 2015, referral from Nurse Echeverry.  (Tr. 355-

57); *see also* (Tr. 361-62) (Nurse Echeverry's examination and referral).  Tudico noted that conservative treatment – physical therapy, medication, and epidural steroid injections – had not helped Mitchell's pain.  (Tr. 355).  Examination and an MRI showed mild degenerative changes in the spine, normal spine health, no paraspinal pain, normal muscle bulk, full strength, normal sensation, and a normal gait.  (Tr. 356).  On March 28, 2016, Dr. Ruch found that a follow-up MRI showed only "some slight degenerative disease" in Mitchell's spine and that there was "no [neurological] reason for [Mitchell's] back pain and her posture."  (Tr. 346).

On February 29, 2016, Mitchell told Dr. Bogar that pain management had not helped her. (Tr. 348).  Dr. Bogar refilled Mitchell's pain medications, ordered a knee x-ray, and recommended a follow-up with a spine surgeon.  (Tr. 349).  On July 14, 2016, Mitchell reported continued pain, fatigue, and headaches, and Dr. Bogar referred her to pain management.  (Tr. 339-41).  On December 1, 2016, Dr. Bogar noted that Mitchell had not gone to pain management, failed physical therapy, and used tramadol, Motrin, other NSAIDs, and heat for her pain.  (Tr. 814).  Dr. Bogar diagnosed Mitchell with chronic headaches, spondylosis of the lumbar spine without myelopathy or radiculopathy, chronic bilateral back pain without sciatica, knee pain, hypothyroidism, and B12 deficiency.  (Tr. 816).  He continued Mitchell's Topamax, refilled her tramadol, and referred her to pain management.  (Tr. 816).

On July 28, 2016, Mitchell saw Alla Model, MD, for a rheumatology consultation.  (Tr. 336).  Examination revealed no deformities in her extremities, mild fullness of pip joints with decreased grip, normal gait, normal reflexes, and intact sensation.  (Tr. 338).  Dr. Model diagnosed Mitchell with low back pain at multiple sites and ordered testing for inflammatory markers.  (Tr. 338).  The inflammatory testing was negative.  (Tr. 814).

On March 28, 2017, Mitchell told Abdallah Kabbara, MD, that she had no pain relief from medications and physical therapy.  (Tr. 1216).  Steroid injections gave her short-term relief.

5

(Tr. 1216).  Examination revealed a normal range of motion in Mithcell's neck, back and extremities.  (Tr. 1217-18).  Dr. Kabbara also noted that Mitchell had a normal mood and affect.  (Tr. 1218).  Dr. Kabbara referred Mitchell to physical therapy and prescribed Cymbalta and Mobic.  (Tr. 1218).  On April 25, 2017, Dr. Kabbara gave Mitchell a medial nerve branch block to assist with her pain.  (Tr. 1215).

### 2. Mental

On April 22, 2016, Mitchell saw Susan Shefner, Psy.D., for a counseling intake evaluation.  (Tr. 797-801; *see also* Tr. 1205-09).  Mitchell told Dr. Shefner that she "sometimes feels like [she] could be bipolar" because she had different moods and was never happy when she was a child.  (Tr. 797).  Mitchell said that she lived off her boyfriend's income and had one friend from high school, but she mostly kept to herself.  (Tr. 797).  She said she had back pain and arthritis that interfered with her ability to do things around the house.  (Tr. 799).  Mitchell always felt sad and she had inconsistent self-esteem, history of suicidal ideation, anxiety with panic attacks, traumatic stress from a history of physical and sexual abuse, anger, difficulty with concentration and memory, frequent mood swings, and difficulty sleeping.  (Tr. 799).  On examination, Dr. Shefner noted Mitchell had normal behavior, cognition, memory, insight, judgment, mood, thought content, and concentration.  (Tr. 799).  Mitchell expressly said that "she ha[d] not had any previous [mental health] diagnosis."  (Tr. 800).  Dr. Shefner recommended psychotherapy and medication management.  (Tr. 800).  Between May 2, 2016, and February 7, 2018, Mitchell saw Dr. Shefner for 25 psychotherapy sessions, during which she consistently noted feeling anxiety related to family stressors – her son's arrest and her relationship with her boyfriend after she visited an ex-boyfriend in prison and continued to communicate with him.  (Tr. 730, 733, 737-39, 746, 754, 756, 775, 777, 788, 796, 1142-43, 1149, 1155, 1161, 1168, 1252, 1261, 1266-67, 1276-77, 1286, 1291; *see also* Tr. 1162).

Mitchell also had nine case management sessions from July 27, 2016, to November 1, 2016, at which case managers observed that she had logical thought processes based in reality, stable mood, appropriate behavior, and some anxiety.  (Tr. 731-32, 735-36, 740, 747, 755, 757).

On May 11, 2016, Mitchell saw Stephanie Harris, APRN, NP-C, for medication management.  (Tr. 790-95).  Mitchell told Nurse Harris that she felt like she was getting worse even though she had been on antidepressants for ten years.  (Tr. 790).  Mitchell reported that over the previous month she had experienced severe depression, mood swings, anxiety, panic attacks, irritability, agoraphobia, racing thoughts, sleep disturbance, insomnia, low energy, impaired concentration, impulse control problems, auditory/visual hallucinations (heard son's voice and saw shadows), flashbacks to childhood abuse, and excessive crying/laughing.  (Tr. 790).  She also said she sometimes "wonder[ed] if she just took her medication or not."  (Tr. 790).  And she said she had chronic pain.  (Tr. 790).  Nurse Harris noted that Mitchell was prescribed Prozac, Ativan, Buspar, and topiramate.  (Tr. 792).  On examination, Nurse Harris found that Mitchell had normal eye contact, normal motor activity, normal speech, normal gait, logical thought processes, depressed mood, full affect, impaired attention/concentration, intact reasoning, immediate memory loss, and good insight/judgment.  (Tr. 793).  Nurse Harris diagnosed Mitchell with PTSD and major depressive disorder.  (Tr. 794).  Nurse Harris continued Mitchell's medications and referred her for individual therapy.  (Tr. 795).

On May 26, 2016, Mitchell told Tiffany Martin, RN, that her anxiety had "improved some" with Buspar, but she continued to have two to three anxiety attacks per week, insomnia, and unchanged depression.  (Tr. 783).  Mitchell reported that over the previous month she had experienced severe depression, anxiety, moderate mood swings, impaired concentration, irritability, racing thoughts, insomnia, unusual thoughts, flashbacks, excessive crying/laughing, auditory/visual hallucinations, and chronic pain.  (Tr. 783-84).  Michell denied any memory loss.

7

(Tr. 784).  On examination, Nurse Martin found average motor activity, average insight, normal

speech, normal gait, logical thought processes, and full affect.  (Tr. 784-85).  Nurse Martin

continued Mitchell's medications and added Rexulti, Buspirone, and trazadone.  (Tr. 786).

On June 2, 2016, Mitchell told Pamela Pardon, CNP, that she felt "a little bit more calmer

than [she] used to."  (Tr. 778).  She said that over the previous month she had experienced severe

depression, moderate mood swings, panic attacks, moderate irritability, moderate racing

thoughts, sleeping problems, low energy, moderately impaired concentration, unusual/intrusive

thoughts, auditory/visual hallucinations, flashbacks, and immediate memory loss.  (Tr. 778-79).

On examination, Nurse Pardon noted Mitchell had average motor activity, normal gait, normal

speech, persecutory delusions, logical thought processes, depressed/anxious mood, flat affect,

impaired attention/concentration, somewhat impaired abstraction, impaired memory, average

insight, fair judgment, and intact reasoning.  (Tr. 780).  Nurse Pardon continued Mitchell's

medications and added lorazepam.  (Tr. 781).

On June 28, 2016, Mitchell told Nurse Harris that her medications helped without any

adverse reactions.  (Tr. 769).  She reported that over the previous month her depression and

anxiety were reduced to a moderate level, she no longer had mood swings or panic attacks, and

her auditory/visual hallucinations had stopped.  (Tr. 769).  Mitchell also reported normal

concentration and no memory loss.  (Tr. 769).  She denied having any chronic pain or other

physical symptoms.  (Tr. 769).  On examination, Nurse Harris noted that Mitchell had good

insight/judgment, normal impulse control, logical thought processes, and no delusions.  (Tr.

770).  Nurse Harris continued Mitchell's medications.  (Tr. 772).  At a follow-up on July 13,

2016, Mitchell said that she continued to improve, and her anxiety had reduced to a mild level.

(Tr. 763).  She still had moderate depression, moderate mood swings, moderate irritability,

moderately impaired concentration, and episodic memory loss.  (Tr. 763).  Nurse Harris added

8

prazosin to Mitchell's medications. (Tr. 765-66). On July 27, 2016, Mitchell told Nurse Harris that she no longer had depressive symptoms, mood swings, concentration impairment, unusual thoughts, memory loss, excessive crying/laughing, or auditory/visual hallucinations. (Tr. 758). She continued to have moderate anxiety. (Tr. 758). Examination showed normal thought content, logical thought processes, euthymic mood, full affect, no concentration impairment, normal impulse control, and good insight/judgment. (Tr. 759). Nurse Harris continued Mitchell's medications. (Tr. 760-61).

On August 23, 2016, Mitchell told Robert Toth, Pharm. D., that during the month before her appointment she had moderate depression, moderate mood swings, mild anxiety, no panic attacks, moderate irritability, moderately impaired concentration, no unusual thoughts, no hallucinations, and no memory loss. (Tr. 748). Mitchell also denied chronic pain or other physical symptoms. (Tr. 748). On examination, Dr. Toth noted normal gait, normal speech, logical thought processes, depressed mood, normal memory, full affect, intact cognition, and good judgment/insight. (Tr. 749). Dr. Toth continued Mitchell's medications and added Latuda. (Tr. 750-51).

On September 6, 2016, Mitchell told Nurse Harris that she was doing well on her medications without any adverse reactions. (Tr. 741). Mitchell reported that over the previous month she had no depression, anxiety, mood swings, panic attacks, irritability, unusual thoughts, hallucinations, compulsions, concentration issues, or memory loss. (Tr. 741) She denied any chronic pain or other physical issues, and examination showed a normal gait. (Tr. 741-42). Nurse Harris continued Mitchell's medications. (Tr. 743).

On December 27, 2016, Mitchell told Patience Chanay, LPN, that she felt "a little" depressed and anxious but also noted that she had a cold and was without medication for a while. (Tr. 1162). Mitchell said that over the previous month she had moderate depression, no mood

swings, moderate anxiety, panic attacks, moderately impaired concentration, no unusual thoughts or hallucinations, and no memory loss.  (Tr. 1162).  Examination showed a normal gait, depressed mood, normal thought content, circumstantial thought processes, normal memory, intact reasoning, average insight, and fair judgment.  (Tr. 1163-64).  Nurse Chanay continued Mitchell's medications and added lurasidone.  (Tr. 1164-66).

On January 23, 2017, Vinod Bhandari, MD, noted that Mitchell "sa[id she] ha[d a] diagnosis of bipolar DS [and] PTSD."  (Tr. 1156).  Mitchell said that she was doing well overall, tolerated her medications, and slept well.  (Tr. 1156).  Mitchell reported that, since her last visit, she had no depression, mild mood swings, mild anxiety, no panic attacks, mild irritability, mildly impaired concentration, no unusual thoughts, no hallucinations, and no memory loss.  (Tr. 1156).  She also denied chronic pain or other physical symptoms.  (Tr. 1156).  Examination showed a normal gait, intact cognition, logical thought processes, depressed mood, intact reasoning, normal memory, good insight/judgment, and normal impulse control.  (Tr. 1157).  Dr. Bhandari continued Mitchell's medications.  (Tr. 1158-59).

On February 13, 2017, Mitchell told Dr. Bhandari that her medications helped make her calm and she was happy with them.  (Tr. 1150).  Dr. Bhandari noted that Mitchell was diagnosed with bipolar disorder with depressive symptoms.  (Tr. 1150).  Mitchell said that, since her last visit, she had no depression, mood swings, anxiety, panic attacks, irritability, concentration problems, compulsions, unusual thoughts, hallucinations, or memory loss.  (Tr. 1150).  She also denied chronic pain or other physical symptoms.  (Tr. 1150).  Examination showed normal speech, thought content, logical thought process, euthymic mood, full affect, no cognition issues, normal memory, good insight/judgment, and intact reasoning.  (Tr. 1151).  Dr. Bhandari continued Mitchell's medications and increased her Latuda dosage.  (Tr. 1152-53).  Dr. Bhandari noted continued improvement on March 13, 2017; however, on April 19, 2017, Mitchell reported

10

some increased, mild depression, mood swings, irritability, anxiety, and concentration impairment.  (Tr. 1144-47, 1136).  Also on April 19, 2017, Dr. Bhandari assessed that Mitchells' appropriate "diagnosis appear[ed] to be Bipolar DS Depressed."  (Tr. 1136).  Dr. Bhandari prescribed Lamictal in addition to Mitchell's other medications.  (Tr. 1136).  At a follow-up on May 17, 2017, Mitchell noted that she had "mildly improved" and Dr. Bhandari increased the Lamictal dosage.  (Tr. 1292, 1294).

On June 14, 2017, Mitchell told Dr. Bhandari that, since her previous visit, she had mild depression, mood swings, and anxiety.  (Tr. 1287).  She denied irritability, unusual thoughts, hallucinations, memory loss, concentration impairments, and chronic pain or other physical symptoms.  (Tr. 1287).  Dr. Bhandari again increased Mitchell's Lamictal dosage.  (Tr. 1287, 1289).  At a follow-up on July 12, 2017, Mitchell told Dr. Bhandari that her depression was mild, and her mood was better.  (Tr. 1282). Dr. Bhandari continued Mitchell's medications.  (Tr. 1282, 1284).  On August 7, 2017, Dr. Bhandari noted that Mitchell was "overall stable," but she continued to have "some mood swings, depression, and anxiety."  (Tr. 1278).  She did not have any concentration issues or memory loss.  (Tr. 1278-79).  Dr. Bhandari increased Mitchell's Latuda dosage and indicated that Seroquel or Geodon could also help Mitchell's anxiety and depression.  (Tr. 1278).

On September 29, 2017, Dr. Bhandari noted that Mitchell's insurance company denied her Latuda, and Mitchell reported feeling more depressed and having increased mood swings. (Tr. 1272).  She had mild concentration issues, but she had no memory loss.  (Tr. 1272-73). Dr. Bhandari continued Mitchell's medications and added Abilify.  (Tr. 1272, 1274).  At a follow-up on October 27, 2017, Mitchell told Dr. Bhandari that her Abilify had just been approved the day before her appointment, and that she had not yet noticed a difference in her symptoms.  (Tr. 1268).  On November 17, 2017, Mitchell said that she felt better on Abilify.

(Tr. 1262).  She said that since her last visit she had mild depression, mood swings, irritability, mild anxiety, no racing thoughts, no panic attacks, no concentration issues, normal energy, and no memory loss.  (Tr. 1262-63).  She also denied chronic pain or other physical symptoms.  (Tr. 1262).  Examination showed average motor activity, normal gait, normal thought content, logical thought processes, euthymic mood, full affect, average insight, fair judgment, and normal impulse control.  (Tr. 1263).  Dr. Bhandari continued Mitchell's medications.  (Tr. 1262, 1264-65).  On December 15, 2017, and January 12, 2018, Mitchell reported continued stability and improvement, although mild depression and anxiety symptoms remained.  (Tr. 1253-60).

On February 9, 2018, Mitchell reported increased anxiety and irritability, which she attributed to stress at home.  (Tr. 1249).  Her reported symptoms remained generally unchanged and Dr. Bhandari continued her medications.  (Tr. 1249, 1250-51).  On March 20, 2018, Mitchell told Dr. Bhandari that her symptoms were still the same and that Abilify and Ativan were her "most helpful med[ications]."  (Tr. 1245).

## B. Relevant Opinion Evidence

### 1. Stephanie Harris, APRN, NP-C

On September 22, 2016, Nurse Stephanie Harris completed a mental capacity assessment based on her experience treating Mitchell.[3]  (Tr. 324-26).  Nurse Harris opined that Mitchell had "slight" limitations in understanding, remembering, and carrying out very short and simple instructions.  (Tr. 324).  She had "moderate" limitations in remembering locations and work-like procedures; understanding a remembering detailed instructions; carrying out detailed instructions; performing activities within a schedule; maintaining regular attendance; being punctual within customary tolerances; performing at a constant pace with a standard number and

---

[3] This opinion was rendered prior to Mitchell's amended onset date of October 14, 2016.  ECF Doc. 11 at 3.

length of rest periods; maintaining socially appropriate behavior; adhering to basic standards of neatness and cleanliness; being aware of normal hazards, and taking appropriate precautions. (Tr. 324-26).  She had "marked" limitations in maintaining attention and concentration for extended periods; sustaining an ordinary routine without special supervision; working in coordination with or in proximity to others without being distracted by them; making simple work-related decisions; completing a normal workday/workweek without interruptions from psychologically based symptoms; interacting appropriately with the general public; asking simple questions or requesting assistance; accepting instructions; responding appropriately to criticism from supervisors; responding appropriately to changes in the work setting; setting realistic goals; and making independent plans.  (Tr. 324-26).  She had extreme limitations in getting along with coworkers or peers without distracting them or exhibiting behavioral extremes, traveling in unfamiliar places, and using public transit.  (Tr. 325-26).  Nurse Harris specifically noted that Mitchell did "not function well in any social situations."  (Tr. 326).

### 2. Consultative Examiner – Todd Ott, OTR/L, CEAS

On November 6, 2017, Todd Ott, OTR/L, CEAS, examined Mitchell and completed a functional capacity evaluation.  (Tr. 1234-38).  Ott noted that Mitchell drove to the examination. (Tr. 1234).  Ott noted that he observed moderate effort from Mitchell during testing, and that Mitchell believed she could tolerate very limited activities and perform minimal tasks.  (Tr. 1234).  He noted that Mitchell's pain limited her lifting, bending, and standing, and she had to take breaks throughout the examination.  (Tr. 1234).  Mitchell exhibited generalized weakness and verbalized pain with standing and positional changes.  (Tr. 1234-35).  Although she had a functional active range of motion in her upper extremities, activity aggravated her back pain. (Tr. 1235).  Examination testing showed that Ott could frequently lift 10 pounds from the floor to her waist or shoulder, occasionally lift 10 pounds from her waist to her shoulder, occasionally

13

carry 10 pounds, and occasionally push or pull with 50 pounds of force. (Tr. 1235). Mitchell could occasionally sit, stand, walk, climb stairs, balance, crawl, squat, kneel, stoop, crouch, reach overhead, do fine controlling and grasping with her hands, and operate a motor vehicle. (Tr. 1236). She could rarely bend, push, or pull. (Tr. 1236). Mitchell was able to follow commands and directions; elevate her shoulders; and complete all tasks with limited tolerance for bending, sitting, standing, and transitional movements. (Tr. 1237). In summarizing his examination findings, Ott opined that Mitchell could lift less than 10 pounds at all levels of function. (Tr. 1238). She could perform transitional movements, but she was guarded, had limited mobility due to back pain, and had generalized weakness and fatigue with all tasks. (Tr. 1238). She could sit for up to 60 minutes with weight shifts, walk 320 feet, and stand less than 30 minutes. (Tr. 1238). He indicated that Mitchel "would most likely be unreliable," miss more than 4 days of work per month and be unable to complete an 8-hour workday. (Tr. 1237).

### 3.     Examining Psychologist – Thomas Evans, Ph.D.

On January 12, 2017, Thomas Evans, Ph.D., evaluated Mitchell's mental capacity. (Tr. 804-08). Dr. Evans noted that Mitchell was friendly and cooperative throughout the evaluation. (Tr. 804). Mitchell told Dr. Evans that, when she worked, she was able to get along "okay" with coworkers and others in general. (Tr. 805). Mitchell noted that she was sometimes irritable with customers, but she was never fired from a job. (Tr. 805). She said she had no difficulties taking directives from supervisors. (Tr. 805). Mitchell said that she did "approximately 40% of the cooking, cleaning, and laundry," and she had a checking account. (Tr. 806). Mitchell sat comfortably throughout the session and did not show any physical distress. (Tr. 806). On examination, Mitchell had normal ambulation, normal speech, good eye contact, a euthymic mood, no noted anxiety, no psychosis or delusions, no noted cognitive or sensory issues, and adequate insight/judgment. (Tr. 806-07). Based on his evaluation, Dr. Evans opined that

Mitchell could: (1) understand and carry out simple to moderately complex workplace instructions; (2) maintain attention, concentration, and focus without any difficulties; (3) get along with coworkers; and (4) take directives from authority figures.  (Tr. 807-08).

### 4.    Consultative Evaluator – Victoria Corell, ANP-C

On November 9, 2017, Victoria Correll, ANP-C, conducted a physical assessment.  (Tr. 1240-41).  Nurse Corell noted that Mitchell was diagnosed with chronic low back pain and that Mitchell said her symptoms were frequently severe enough to interfere with her attention and concentration.  (Tr. 1240).  Mitchell also said that her medications caused dizziness.  (Tr. 1240).  Nurse Corell opined that Mitchell could walk for one to two blocks before having significant pain, she could sit for up to two hours in a workday, and she could not stand/walk for work.  (Tr. 1240).  Corell opined that Mitchell would need 10 to 12 breaks throughout the day, which would last for 5 to 10 minutes each.  (Tr. 1240).  She could occasionally lift less than 10 pounds, but never more.  (Tr. 1240).  She could use her right hands and arms for 5% of the workday and left hands and arms for 10% of the workday.  (Tr. 1240).  Further, Nurse Corell opined that Mitchell would be absent from work more than four times per month.  (Tr. 1241).

### 5.    State Agency Consultant – William Bolz, MD

On March 6, 2017, state agency consultant William Bolz, MD, assessed Mitchell's physical capacity based on a review of the record.  (Tr. 74-76).  Dr. Bolz opined that Mitchell could lift or carry up to 20 pounds occasionally and 10 pounds frequently; stand/walk for up to 6 hours in an 8-hour workday; sit for up to 6 hours in an 8-hour workday; and occasionally push/pull with her right lower extremities due to pain.  (Tr. 74).  She could occasionally climb ramps, stairs, ladders, ropes, or scaffolds; balance; stoop; kneel; crouch; and crawl.  (Tr. 74-75).  Dr. Bolz opined that Mitchell could perform light work.  (Tr. 76).  On May 15, 2017, Rainnie Amiri, MD, concurred with Dr. Bolz's opinion, except that Dr. Amiri found that Mitchell:

(1) was unlimited in pushing or pulling; (2) could frequently climb ramps/stairs, kneel, and crouch, and balance; (3) could occasionally stoop and crawl; and (4) could never climb ladders, ropes, or scaffolds.  (Tr. 105-08).

### C.    Function Report

On November 12, 2016, Mitchell completed a function report.  (Tr. 270-77).  In her function report, Mitchell stated that she had a "hard time standing for any length of time" due to back pain.  (Tr. 270).  Mitchell said that she had "no problem" taking care of her personal needs, except that she had to put up a bar in her bathroom after she fell while bathing.  (Tr. 271).  She said that she did not need "special reminders to take care of personal needs and grooming" or "help or reminders taking medicine."  (Tr. 272).  Mitchell indicated that she prepared her own meals daily, including sandwiches and frozen dinners; however, she did not "cook homestyle meals anymore."  (Tr. 272).  Mitchell said that she did laundry for 20 minutes every 2 days, and she did not need help or encouragement to do it.  (Tr. 272).  She indicated that she could drive, go out alone, shop for necessities in stores or by computer, and manage her finances.  (Tr. 273).  She read once a week but had decreased interest in doing so.  (Tr. 274).  Mitchell also said that she socialized with others by visiting with them or talking on the phone once a week.  (Tr. 274).  Mitchell said that she could follow written instructions, but she had trouble following spoken instructions.  (Tr. 275).  Finally, Mitchell indicated that she got along "fine" with authority figures, and that she had never been fired due to problems getting along with people.  (Tr. 276).

### D.    Relevant Testimonial Evidence

Mitchell testified at the ALJ hearing.  (Tr. 44-57).  Mitchell testified she did not see any friends or family on a regular basis (other than the people she lived with), and she spent her day watching TV, reading magazines, and lying around the house.  (Tr. 48-49, 54).  She had "a little bit" of difficulty maintaining her concentration while reading.  (Tr. 49).  Mitchell also used

Facebook to follow other people who she did not see, but she rarely posted anything. (Tr. 49). Mitchell said that she could "do a little bit of cooking, light cooking," but her sons and boyfriend had to do the other household chores (laundry, dishwashing, cleaning, and yard work). (Tr. 50). She said that she drove twice a week to the grocery store. (Tr. 46). Her sons helped with lifting when she grocery shopped. (Tr. 53). When asked if she had any difficulty interacting with others while at the store, Mitchell said that she usually didn't talk to people and kept to herself. (Tr. 50-51). Mitchell said that she did not "feel [she] would deal with the public too well." (Tr. 53).

Mitchell testified that her scoliosis and lower back pain prevented her from working. (Tr. 46). She could not stand or sit for more than 5 minutes, bend over, or walk for too long without her back hurting. (Tr. 46-47). Mitchell said that her pain was present for "about 90%" of the day, and that it rated as an 8 out of 10 in severity without medication. (Tr. 46-47). Medication reduced her pain to a 7 out of 10 in severity. (Tr. 47). Due to her back pain, Mitchell could walk less than a mile and lift "maybe two pounds." (Tr. 48). She said that bending, twisting, walking, and using stairs made her back pain worse, and that none of her treatments had helped. (Tr. 52). She said that using heat gave temporary relief, and epidural steroid injections did not work. (Tr. 52). Mitchell also had some pain in her legs due to varicose veins, which caused pain when using her feet. (Tr. 56-57).

Mitchell also testified that she was increasingly depressed and that her bipolar disorder had worsened. (Tr. 51). Mitchell's depression and other symptoms were worse when she was stressed, in a bad mood, or irritable. (Tr. 51). But she was switching medications to stabilize herself. (Tr. 51). Mitchell said that she sometimes forgot whether she had taken her medication. (Tr. 48). She also said that she sometimes heard voices, had between two and three panic attacks per week, and had chronic headaches four times per week. (Tr. 54-55).

17

**IV.     The ALJ's Decision**

The ALJ's November 19, 2018, decision found that Mitchell was not disabled and denied her applications for DIB and SSI.  (Tr. 15-31).  The ALJ found Mitchell had the severe impairments of "mild degenerative disc disease of the lumbar spine, mild degenerative changes of the left and right wrists, mild degenerative changes to the right sacroiliitis [sic] joint, varicose veins, migraines, depression, anxiety, and posttraumatic stress disorder (PTSD)."  (Tr. 18).  The ALJ also determined that none of Mitchell's mental or physical impairments singly or in combination met or medically equaled a listed impairment.  (Tr. 18-21).  Regarding Mitchell's mental impairments, the ALJ determined that the record as a whole showed that Mitchell had only  moderate limitations in understanding, remembering, and applying information because: (1) she testified that she had memory problems, and psychiatric records showed intrusive thoughts and impaired memory; but (2) her own reports and medical records also showed that she did not need reminders for her medications, she could shop on computers, she could follow spoken instructions, she had logical thought processes, and she had normal memory.  (Tr. 19). The ALJ found that Mitchell had only moderate limitations in interacting with others because, although she reported difficulty with instructions, mood swings, and panic attacks, she was able to live with others, socialize on Facebook, go out alone, shop in public, and get along with authority figures.  (Tr. 20).  The ALJ found that Mitchell had only moderate limitations in concentrating, persisting, or maintaining pace because records showed that she could drive, watched television, read magazines, used a computer, could count change, had no cognition impairments, had normal impulse control, and had logical thought processes.  (Tr. 20).  And the ALJ found that Mitchell had only mild limitations in adapting or managing herself because she could take care of her personal needs, did not need medication reminders, could prepare simple meals, could do laundry, drove, shopped, and could go out alone.  (Tr. 20).

The ALJ determined that Mitchell had the RFC to perform light work, except that she:

> can frequently operate left foot controls; she can occasionally balance stoop, kneel, crouch, crawl, and climb ramps and stairs and never climb ladders, ropes, or scaffolds; the individual can never be exposed to unprotected heights or moving mechanical parts and never operate a motor vehicle; the claimant is limited to performing simple, routine, and repetitive tasks, but not at a production rate pace (*i.e.*, assembly line work); she is limited to simple work-related decisions in using her judgment and dealing with changes in the work setting; and the individual is able to frequently interact with supervisors and occasionally interact with coworkers and the public.

(Tr. 21).  In assessing Mitchell's RFC, the ALJ explicitly stated that he "considered all symptoms" in light of the medical and other evidence in the record.  (Tr. 21).  The ALJ considered Mitchell's subjective testimony that her back pain and mental health symptoms made walking and postural transitions difficult, decreased her motivation, caused sleep trouble, made handling stress difficult, gave her panic attacks, and made remembering to take medications difficult.  (Tr. 22).  But the ALJ determined that Mitchell's subjective complaints were not consistent with the other record evidence that showed she could drive, live with others, read, watch TV, take care of her personal needs, cook, clean, do laundry, handle money, get along with others, and follow instructions.  (Tr. 22-23).

The ALJ also included in his opinion an exhaustive discussion of Mitchell's medical treatment records, including Mitchell's mental health treatment and medication management throughout 2016 and 2017.  (Tr. 23-26).  The ALJ noted that Mitchell was diagnosed with PTSD and major depressive disorder in April 2016.  (Tr. 23).  He also noted that Mitchell at times had displayed symptoms including: constricted/flat affect, anxious/depressed mood, irritability, mood swings, nightmares, intrusive thoughts, and impaired memory.  (Tr. 23-26, 29).  The ALJ also gave "great weight" to Dr. Evans's opinion and "little weight" to Nurse Corell's opinion.  (Tr. 28-29).

19

The ALJ stated that he gave "little weight" to Nurse Harris's opinion because it was inconsistent with the medical evidence and Mitchell's reported activities.[4]  (Tr. 27-28). Specifically, the ALJ stated that:

> Medical records show that the claimant displayed good eye contact, no psychomotor agitation, a cooperative behavior, a euthymic mood, a congruent and full affect, no evidence of anxiety, normal speech, no delusions, no auditory or visual hallucinations, logical thought processes, no loose associations, average intelligence, full orientation, normal memory, intact reasoning ability, non-impaired cognition, good insight and judgment, normal impulse control, good reliability, and no obsessions or compulsions.  Further, the claimant reported that she had no problems maintaining her own personal care, did not need reminders to take medication, prepared simple meals, did laundry, drove a car, could go out alone, shopped in stores and by computer, had no problems handling money or bank accounts, read, socialized with others, had no problems getting along with others, was good at following spoken instructions, and got along well with authority figures.

(Tr. 28) (citations omitted).  The ALJ also noted that Nurse Harris was not an "acceptable medical source" under 20 C.F.R. §§ 404.1513, 416.913.  (Tr. 28).

The ALJ also stated that he gave "little weight" to Occupational Therapist Ott's opinion because the limitations described in it were:

> inconsistent with the medical evidence, which shows that the claimant displayed a supple and non-tender neck, no respiratory distress, a regular heart rate and rhythm, no edema, non-tender sacroiliac joints, full range of motion in the extremities without tenderness, no edema, intact sensation, no focal deficits, full motor strength, no neurological abnormalities, normal deep tendon reflexes, and negative straight leg raise testing.

(Tr. 28) (citation omitted).  The ALJ also noted that Ott was not an "acceptable medical source" under 20 C.F.R. §§ 404.1513, 416.913.  (Tr. 28).

Because Mitchell was not able to perform all or substantially all of the full range of light work, the ALJ turned to vocational expert testimony to determine whether Mitchell could perform work in the national economy despite her impairments.  (Tr. 30).  Based on the

---

[4] The ALJ did not mention that Nurse Harris expressed her opinion several weeks before the Mitchell's alleged onset date.

vocational expert testimony, and considering Mitchell's RFC, age, and experience, the ALJ

concluded that Mitchell could "perform the requirements of representative occupations such as

clerical assistant, bench assembler, [and] mail clerk."  (Tr. 30-31) (citations omitted).

Accordingly, the ALJ found that Mitchell was not disabled from October 14, 2016, through the

date of his decision.  (Tr. 31).

## V.      Law & Analysis

### A.      Standard of Review

In Social Security cases, the court's review is limited to determining: (1) whether the ALJ

applied proper legal standards in issuing his decision; and (2) whether substantial evidence

supported the ALJ's decision.  42 U.S.C. § 405(g); 1383(c)(3); *Rogers v. Comm'r of Soc. Sec.*,

486 F.3d 234, 241 (6th Cir. 2007).  If the court answers "yes" to both questions, it must affirm

the Commissioner's decision – even if the court might have decided the claim differently on its

own.  *Cf. Biestek v. Comm'r of Soc. Sec.*, 880 F.3d 778, 783 (6th Cir. 2017) ("[A] decision

supported by substantial evidence must stand, . . . It is not our role to try the case *de novo*."

(quotation omitted)).

"Substantial evidence" is *any evidence* that a reasonable person could believe is enough

to back up the decision.  *See Biestek*, 880 F.3d at 783 (citing *Richardson v. Perales*, 402 U.S.

389, 401 (1971)); *Rogers*, 486 F.3d at 241.  It does not require that *most* of the evidence in the

record support the decision.  *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir.

2006) ("Substantial evidence is more than a scintilla of evidence but less than a

preponderance.").  It also does not require the court to agree that the evidence relied upon was

the most important or credible evidence in the record.  *Biestek*, 880 F.3d at 783 (noting that the

court does not "resolve conflicts in evidence nor decide questions of credibility" (quoting

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997))).  If the Commissioner's

factual conclusions were reasonably drawn from the record, they are within the Commissioner's "zone of choice" and cannot be second-guessed by the court. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

Even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and [when] that error prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) (indicating that the court should remand only when an error prejudiced the claimant on the merits – *i.e.*, when the error is not harmless). Furthermore, the court will not uphold a decision, when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting Sarchet v. Charter, 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-CV-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue*, No. 2:10 CV 017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-CV-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010). Requiring an accurate and logical bridge ensures that a claimant, as well as a reviewing court, will understand the ALJ's reasoning.

The Social Security regulations outline a five-step process the ALJ must use to determine whether a claimant is entitled to benefits: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of

impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform his past relevant work in light of his RFC; and (5) if not, whether, based on the claimant's age, education, and work experience, he can perform other work found in the national economy.  20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006).  Although it is the Commissioner's obligation to produce evidence at Step Five, the claimant bears the ultimate burden to produce sufficient evidence to prove that he is disabled and, thus, entitled to benefits.  20 C.F.R. §§ 404.1512(a), 416.912(a).

### B.  Weighing of Non-Acceptable Medical Source Opinions

Mitchell's initial brief raises two issues which both challenge the ALJ's decision to give "little weight" to the opinions of two non-acceptable medical sources: Nurse Harris and Occupational Therapist Ott.  ECF Doc. 11 at 13-18.

At Step Four, an ALJ must weigh every medical opinion that the Social Security Administration receives.  20 C.F.R. §§ 404.1527(c), 416.927(c).  Under the social security regulations, a "medical opinion" must come from an "acceptable medical source" in order to be entitled to any sort of deference.  *See* 20 C.F.R. §§ 404.1513(a)(2), 416.913(a)(2); *cf. Hill v. Comm'r of Soc. Sec.*, 560 F. App'x 547, 550 (6th Cir. 2014) (unpublished) (stating that opinions from non-acceptable medical sources are not entitled to any "special deference").  Although the Social Security Administration expanded the kinds of providers who qualify as "acceptable medical sources" for cases filed after March 27, 2017, *see* 20 C.F.R. §§ 404.1502(a), 416.902(a), only licensed physicians, psychologists, optometrists, podiatrists, and speech-language pathologists qualified as "acceptable medical sources" when Mitchell filed her claim in 2016, *see* 20 C.F.R. §§ 404.1513(a) (2016), 416.913(a) (2016).  When a provider who is not an "acceptable

23

medical source" gives an opinion, an ALJ is required to consider it "along with the other relevant evidence in the file."  SSR 06-3p, 2006 SSR LEXIS 5 (Jan. 1 2006) (noting that nurse practitioners, *inter alia*, have increasingly assumed a greater percentage of treatment and evaluation functions).[5]  In evaluating such evidence, the ALJ must consider: (1) how long the source has known and how frequently the source has seen the individual; (2) how consistent the opinion is with other evidence; (3) the degree to which the source presents relevant evidence to support an opinion; (5) whether the source has a specialty or area of expertise related to the individual's impairment(s); and (6) any other factors that tend to support or refute the opinion. *Id.*

An ALJ is not required to articulate "good reasons" for discounting a non-acceptable medical source's opinion. *Pruitt v. Comm'r of Soc. Sec.*, No. 1:16-cv-2927, 2018 U.S. Dist. LEXIS 49512, at *44 (N.D. Ohio 2018).  But the ALJ should "generally explain the weight given to opinions from these "other sources," or otherwise ensure that the discussion of the evidence . . . allows a claimant or subsequent review to follow the adjudicator's reasoning."  SSR 06-3p, 2006 SSR LEXIS 5.  To this end, the ALJ need not incorporate his explanation into a single, tidy paragraph; rather, the ALJ's decision is read "as a whole and with common sense." *Buckhannon ex rel. J.H. v. Astrue*, 368 F. App'x 674, 678–89 (7th Cir. 2010).

### 1.    Nurse Harris's Opinion

In her first issue, Mitchell argues that the ALJ's reasons for giving "little weight" to Nurse Harris' opinion – that the restrictions in the opinion were inconsistent with Mitchell's medical records and reported activities – were neither good reasons nor supported by substantial evidence.  ECF Doc. 11 at 13-17.  Specifically, Mitchell asserts that the ALJ improperly failed to

---

[5] The Commissioner rescinded SSR 06-3p for claims filed on or after March 27, 2017. *Rescission of Social Security Rulings 96-2p, 96-5p, and 06-3p*, 82 Fed. Reg. 15263 (Mar. 27, 2017).  Because Mitchell filed her claim on November 25, 2014, SSR 06-3p applies to her claim.

consider Mitchell's bipolar disorder diagnosis and the episodic nature of its symptoms in evaluating the medical findings in the record.  ECF Doc. 11 at 14.  Mitchell also contends that the ALJ overstated her daily living activities by: (1) finding that she needed no reminders to take medication when she testified that she had difficulty remembering to take it; (2) finding that she could do laundry and shop when she testified she needed help to do such chores; and (3) finding that she could socialize with others when she testified that she was housebound and interacted with others only when necessary.  ECF Doc. 11 at 15.  Further, Mitchell argues that, although the ALJ correctly noted that Nurse Harris was not an "acceptable medical source," the ALJ was still required to consider the opinion because it was consistent with other medical evidence and Nurse Harris had treated Mitchell several times.  ECF Doc. 11 at 16.

The Commissioner responds that any error in weighing Nurse Harris's opinion was harmless because the opinion was issued in September 22, 2016, – almost one month before the alleged onset date – and "[a] failure to properly weigh an opinion written before a claimant's alleged onset date cannot be harmful error."  ECF Doc. 13 at 8-9 (citing *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001)).  Further, the Commissioner asserts that the ALJ was not required to provide "good reasons" for discounting Nurse Harris's opinion because she was not an acceptable medical source.  ECF Doc. 13 at 9-10.  The Commissioner contends that inconsistency with the medical record was a good reason for discounting Nurse Harris's opinion and that Mitchell has not shown that the ALJ's failure to expressly discuss Mitchell's bipolar diagnosis – which was not mentioned in Harris's opinion – rendered that conclusion unsupported by substantial evidence.  ECF Doc. 13 at 10-11.  Moreover, the Commissioner argues that the ALJ appropriately characterized Mitchell's daily living activities and appropriately chose which statements among Mitchell's conflicting statements to credit.  ECF Doc. 13 at 11-12.

Mitchell replies that the Sixth Circuit has not held that evidence predating the alleged onset date is irrelevant, but instead has held that it may help establish disability when evaluated in light of later evidence. ECF Doc. 14 at 3. Mitchell also argues that, although the ALJ did not need to provide good reasons for discounting Nurse Harris's opinion, the ALJ was required to explain the weight given to the opinion based on the regulatory factors. ECF Doc. 14 at 3. Further, Mitchell reiterates the arguments raised in her initial brief. ECF Doc. 14 at 4.

As a preliminary matter, the court notes that the Commissioner's reliance on *Heston* for the proposition that the "failure to properly weigh an opinion written before a claimant's alleged onset date *cannot be harmful error*" is unfounded. *See* ECF Doc. 13 at 8 (emphasis added). *Heston* did not say that. *See Heston*, 245 F.3d at 535. At most, *Heston* stands for the proposition that the failure to explicitly consider an opinion *may be harmless error* and that opinions issued before the onset date *are generally* entitled to less weight than more current opinions. *Id.* at 535-36. That is because the Sixth Circuit found harmless an ALJ's failure to consider a physician's opinion *under the particular circumstances of that case – i.e.*, the physician's admitted lack of current information, reliance on notes from his last examination several months before the onset date, and failure to provide an objective basis for his conclusions. *Id.* at 535-36. And the Sixth Circuit expressly stated that "*medical history is relevant to a claimant's condition*," but "should not be given more weight than that of a doctor observing plaintiff during the relevant period of disability." *See id.* at 536. Thus, the Court should reject the Commissioner's assertion that Nurse Harris's opinion was "irrelevant" and "not entitled to any weight or analysis." ECF Doc. 13 at 9.

The ALJ applied proper legal standards in weighing Nurse Harris's opinion. 42 U.S.C. §§ 405(g), 1383(c)(3); *Rogers*, 486 F.3d at 241. Because Nurse Harris, as a nurse practitioner, was not an "acceptable medical source" under the Social Security regulations, the ALJ was not

26

required to give her opinion any special deference or give "good reasons" for discounting it. 20 C.F.R. §§ 404.1513(a) (2016), 415.913(a) (2016); *Hill*, 560 F. App'x at 550; *Pruitt*, 2018 U.S. Dist. LEXIS 49512, at *44. Nevertheless, the ALJ adequately explained that he gave "little weight" to Nurse Harris's opinion because: (1) it was inconsistent with the medical evidence as a whole; and (2) it was inconsistent with Mitchell's reported activities. SSR 06-3p, 2006 SSR LEXIS 5; (Tr. 28). The ALJ also went on to detail what parts of the medical record and hearing testimony he found were inconsistent with Nurse Harris's opinion. (Tr. 28) ("Medical records show that . . . . Further, the claimant reported that . . . ."). Such an explanation is certainly sufficient to allow both Mitchell and the court to follow the ALJ's reasoning. SSR 06-3p, 2006 SSR LEXIS 5. And Mitchell's argument that the ALJ's notation that Nurse Harris was not an acceptable medical source was not a "good reason" for discounting her opinion is unavailing because: (1) such a notation could be *necessary* to explain the regulatory impetus behind not assessing a treating provider's opinion for controlling weight; (2) the ALJ *did not* clearly indicate that Nurse Harris's status was a reason for discounting her opinion's weight; and (3) the "good reasons" requirement was inapplicable to Nurse Harris's opinion. SSR 06-3p, 2006 SSR LEXIS 5; *Pruitt*, 2018 U.S. Dist. LEXIS 49512, at *44; *Compare* (Tr. 28) ("This opinion is given little weight *because* it is inconstant with the medical evidence and the claimant's reported activities." (emphasis added)), *with* (Tr. 28) ("Further, a certified nurse practitioner is not an acceptable medical source under Social Security regulation 404.1513.").

Mitchell's argument that the ALJ failed to apply proper legal procedures in weighing Nurse Harris's opinion when he did not expressly discuss her bipolar diagnosis is also unavailing. Mitchell has not pointed to any regulation or binding decision holding that an ALJ must expressly discuss or consider each diagnosis in explaining the weight given to a non-acceptable medical source's opinion. *See generally* ECF Doc. 11. Mitchell also has not

shown that Nurse Harris – whose opinion was issued four months before Dr. Bhandari wrote the first treatment note indicating that Mitchell was diagnosed with bipolar disorder – assessed any functional limitations based on her bipolar disorder.  (Tr. 324-26, 1156); *cf. Heston*, 245 F.3d at 535-36 (finding harmless an ALJ's failure to consider a *treating physician's opinion* when the physician did not have access to records from the alleged period of disability).  Moreover, reading the ALJ's decision as a whole, it is clear that the ALJ considered all the evidence in the record, including *inter alia*: (1) Dr. Bhandari's treatment notes, in which Mitchell's bipolar diagnosis was noted; and (2) notes indicating that Mitchell at times had a depressed mood, flat affect, mood swings, irritability, impaired memory, anxiety, and a nervous breakdown.  (Tr. 25-27); *Buckhannon ex rel. J.H.*, 368 F. App'x at 678–89.

Substantial evidence also supports the ALJ's reasons for discounting Nurse Harris's opinion.  42 U.S.C. §§ 405(g), 1383(c)(3); *Rogers*, 486 F.3d at 241.  First, substantial evidence supports ALJ's finding that Nurse Harris's opinion was inconsistent with other medical records, including: (1) treatment examination findings that Mitchell had normal eye contact, motor activity, speech, affect, behavior, cognition, memory, insight, judgment, mood, thought content, concentration, reasoning, and impulse control; (2) Mitchell's reports to providers that, in the periods between treatments, she had mild to no depression, anxiety, panic attacks, mood swings, irritability, or memory loss; and (3) Dr. Evans's examination findings that Mitchell had normal speech, normal eye contact, euthymic mood, no anxiety, no psychosis/delusions, no cognitive issues, and adequate insight/judgment.  (Tr. 741, 748-49, 758-59, 763, 780, 784-85, 793, 799, 806-07, 1136, 1144-47, 1150, 1156-57, 1162-64, 1253-60, 1262-63, 1272-73, 1287).  Medical records also indicated that, although Mitchell at times reported symptoms related to depression, anxiety, cognition issues, and memory loss, she was able to significantly reduce or eliminate her

symptoms with treatment and medication.  (Tr. 741-43, 748-51, 758-72, 778-86, 790-95, 1136, 1144-47, 1150-59, 1162-64, 1245, 1253-79, 1282, 1287, 1292, 1294).

Second, substantial evidence supports the ALJ's finding that Mitchell's reported activities conflicted with Nurse Harris's opinion, including: (1) Mitchell's function report that she could maintain personal care, take medications without help or reminders, prepare simple meals, do laundry for 20 minutes every 2 days without help, drive, go out alone, shop in stores and by computer, handle money, read, socialize with others in person or by telephone, and have no problems getting along with others and authority figures; (2) her statements to Dr. Evans that she cooked, did laundry, had no problem getting along with authority figures and coworkers, and was able to follow directives from supervisors; (3) her statements to treatment providers that she was able to socialize with one friend from high school, had a boyfriend, and visited and maintained contact with an ex-boyfriend in prison; and (4) her testimony that she prepared simple meals, drove a car, and read as a hobby.  (Tr. 46-54, 272-76, 730, 777, 797, 805-06, 1162).  Even though Mitchell made other statements in the record – including that she forgot to take her medicine, could not do laundry or clean, did not socialize beyond following people on Facebook, and had trouble following spoken instructions – the ALJ was permitted to credit her other statements showing that she could perform those activities without the court second-guessing that decision.  *Biestek*, 880 F.3d at 783; *Mullen*, 800 F.2d at 545.

Because substantial evidence supported the ALJ's conclusions that Nurse Harris's opinion was inconsistent with the medical record as a whole and with Mitchell's reported activities, the ALJ's decision to give only "limited weight" to Nurse Harris's opinion fell within the Commissioner's "zone of choice."  *Mullen*, 800 F.2d at 545.  Accordingly, I recommend that the Court reject Mitchell's argument that the ALJ's decision to give Nurse Harris's opinion "limited weight" was error.

### 2.      Occupational Therapist Ott's Opinion

Mitchell next argues that the ALJ's reasons for giving "little weight" to Occupational Therapist Ott's opinion – that it was inconsistent with the medical evidence was not a good reason or supported by substantial evidence.  ECF Doc. 11 at 19-20; ECF Doc. 14 at 4-5. Specifically, Mitchell argues that the ALJ's decision to discount Ott's opinion was not supported by substantial evidence because: (1) the ALJ "never assessed [Ott's] examination at all;" and (2) Ott's and Nurse Corell's examination findings supported Ott's opinion.  ECF Doc. 11 at 19-20; ECF Doc. 14 at 4-5.  Further, Mitchell argues that Ott's status as  an unacceptable medical source is not a "good reason" for discounting the opinion.  ECF Doc. 11 at 19; ECF Doc. 14 at 5.

The Commissioner responds that the ALJ complied with the regulations by noting that Ott was not an acceptable medical source and explaining why Ott's opinion was due "little weight" in light of the record as a whole.  ECF Doc. 13 at 12-14.  The Commissioner argues that, although the ALJ was not required to give "good reasons" for discounting Ott's opinion, the ALJ adequately explained that the opinion was inconsistent with the medical record as a whole.  ECF Doc. 13 at 13-14.  Moreover, the Commissioner asserts that the ALJ was not required to expressly discuss all of Ott's examination findings; rather, the record shows that the ALJ sufficiently considered the evidence as a whole.  ECF Doc. 13 at 12-13.

The ALJ applied proper legal standards in weighing Ott's opinion.  42 U.S.C. §§ 405(g), 1383(c)(3); Rogers, 486 F.3d at 241.  Because Ott, as an occupational therapist, was not an "acceptable medical source" under the Social Security regulations, the ALJ was not required to give his opinion any special deference or give "good reasons" for discounting it.  20 C.F.R. §§ 404.1513(a) (2016), 415.913(a) (2016); Hill, 560 F. App'x at 550; Pruitt, 2018 U.S. Dist. LEXIS 49512, at *44.  Nevertheless, the ALJ adequately explained that he gave "little weight" to Ott's opinion because it was inconsistent with other medical evidence in the record.  (Tr. 28).  And, as

he did with Nurse Harris's opinion, the ALJ detailed what evidence he found was inconsistent with Ott's opinion.  (Tr. 28).  Again, such an explanation is sufficient to satisfy the regulations. SSR 06-3p, 2006 SSR LEXIS 5.  And, once more, Mitchell's argument that the ALJ erred by noting that Ott was not an acceptable medical source is unavailing for the same reasons noted in my evaluation of the ALJ's treatment of Nurse Harris's opinion.  *Supra*, Section V.B.1. (citing SSR 06-3p, 2006 SSR LEXIS 5; *Pruitt*, 2018 U.S. Dist. LEXIS 49512, at *44); *compare* (Tr. 28) ("This opinion is given little weight *because* it is inconsistent with the medical evidence . . ." (emphasis added)), *with* (Tr. 28) ("Further, a licensed occupational therapist is not an acceptable medical source under Social Security regulation 404.1513.").

Moreover, Mitchell's assertion that the ALJ "never addressed [Ott's] examination at all" is unfounded.  The ALJ expressly discussed Ott's examination report – the document in which Ott's opinions appeared – and summarized Ott's examination findings/opinion by stating:

> [Mr. Ott] found that the claimant was capable of sedentary work with the ability to lift and carry less than 10 pounds with the ability to occasionally perform all postural and manipulative activities except that the claimant could rarely bend, push, and pull.  Mr. Ott concluded that the claimant would likely miss more than four days a month with an inability to complete an eight-hour workday or tolerate stress.

(Tr. 28).  This summary was accurate.  *See* (Tr. 1234-38).  And it was enough.  The ALJ was not required to give an exhaustive accounting each data point in Ott's examination report – especially when the ALJ did not indicate that an internal inconsistency in Ott's examination report was a reason for discounting Ott's opinion.  *See Conner v. Comm'r of Soc. Sec.*, 658 F. App'x 248, 254 (6th Cir. 2016) ("[W]e do not require an ALJ to discuss every piece of evidence in the record to substantiate the ALJ's decision."); *Boseley v. Comm'r of SSA*, 397 F. App'x 195, 199 (6th Cir. 2010) (The ALJ is not "required to discuss each piece of data in [his] opinion, so long as [he] consider[s] the evidence as a whole and reach[es] a reasoned conclusion."); (Tr. 28).

Substantial evidence also supported the ALJ's conclusion that Ott's opinion was inconsistent with other medical evidence in the record. 42 U.S.C. §§ 405(g), 1383(c)(3); *Rogers*, 486 F.3d at 241. Such evidence includes: (1) physical examination findings regularly indicating that Mitchell had full strength in her extremities, had full or active range of motion, had no gait problems, was in a stable condition, had mild or no edema in her legs, and had normal reflexes and sensation; (2) Mitchell's statements that her back pain was not activity-related; (3) diagnostic imaging interpretations finding that Mitchell's bulging disk was "mild;" (4) Mitchell's statements that her Neurontin gave her "almost complete relief" and other medications helped; (5) Mitchell's continued treatment through heat therapy, home exercise, weight loss, and medications; and (6) the state agency consultants' opinions that Mitchell was restricted in her physical capacity and could perform light work. (Tr. 74-76, 105-08, 338, 346, 356, 364, 385-86, 389, 392, 395-97, 400, 406-07, 421, 428, 433, 438-40, 1217-18). And, assuming Nurse Corell's opinion was consistent with Ott's opinion, it would leave Mitchell in no better position because the ALJ found that Nurse Corell's opinion was due "little weight." (Tr. 29, 1240-41).

The court notes that Ott's findings were also consistent with other evidence, including: (1) Mitchell's report that her pain got worse throughout the day and with activity, home exercise, walking, driving, and sitting; (2) findings that Mitchell's pain and other physical symptoms did not respond to physical therapy, medications, epidural steroid injections, radiofrequency ablation; and (3) examination findings that Mitchell had decreased sensation in her legs, reduced motion in her legs and lumbar spine. (Tr. 355, 361-62, 364, 421, 430-36). But, even if this court would find on *de novo* review that the evidence supporting Ott's opinion was the most important and credible evidence, it would nevertheless be bound to accept the ALJ's well-supported

32

conclusion that Ott's opinion was inconsistent with other evidence in the record.  *Biestek*, 880 F3d at 783; *McClanahan*, 474 F.3d at 833; *Walters*, 127 F.3d at 528.

Because substantial evidence supported the ALJ's conclusion that Ott's opinion was inconsistent with the medical record as a whole, the ALJ's decision to give only "limited weight" to Ott's opinion fell within the Commissioner's "zone of choice."  *Mullen*, 800 F.2d at 545. Accordingly, I recommend that the Court reject Mitchell's argument that the ALJ's decision to give Ott's opinion "limited weight" was error.

### B.      Bipolar Disorder & RFC

Although Mitchell did not raise a freestanding argument that substantial evidence did not support the ALJ's RFC finding when the ALJ failed to consider her bipolar disorder diagnosis, the Commissioner raised the issue in his response brief.  *Compare* ECF Doc. 11 at 14 (discussing the ALJ's failure to consider bipolar disorder only through the lens of whether the ALJ had good reasons for giving "little weight" to Nurse Harris's opinion), *with* ECF Doc. 13 at 6-8 (addressing as a freestanding issue the ALJ's failure to expressly consider Mitchell's bipolar disorder diagnosis in assessing Mitchell's RFC.  Specifically, the Commissioner asserts that, even though the ALJ did not expressly discuss Mitchell's bipolar disorder, the ALJ adequately accounted for all of Mitchell's conditions when evaluating the symptoms caused by her anxiety, PTSD, and depression.  ECF Doc. 13 at 6-8.  Further, the Commissioner asserts that it is unclear whether Mitchell's bipolar disorder diagnosis was based on clinical findings or based only on her statements that she "sometimes fe[lt] like [she] could be bipolar."  ECF Doc. 13 at 7 (citing Tr. 1205).  Finally, the Commissioner asserts that the failure to mention Mitchell's bipolar diagnosis was harmless because Mitchell has not shown how expressly mentioning her bipolar disorder would have changed the ALJ's reasoning.  ECF Doc. 13 at 7.

Mitchell notes that the Commissioner's argument here does not "accurately reflect the issues [Mitchell] raised." ECF Doc. 14 at 2.  Nevertheless, Mitchell replies that the ALJ did not properly account for her bipolar disorder in assessing her RFC because the ALJ did not acknowledge that the benign findings in the record "were actually notations of [Mitchell's] bipolar disorder.  Thus, the ALJ actually used the symptoms of [Mitchell's] bipolar disorder to find her less limited." ECF Doc. 14 at 1.  Further, Mitchell argues that, although she told her provider that she was previously diagnosed with bipolar disorder, Dr. Bhandari noted that her appropriate diagnosis "appear[e]d to be Bipolar Ds Depressed." ECF Doc. 14 at 2 (citing Tr. 1136).  Thus, Mitchell argues, the ALJ's consideration of her anxiety, PTSD, and depression standing alone resulted in a misuse of her bipolar disorder symptoms (*i.e.*, the periodic lack of symptoms). ECF Doc. 14 at 2.

### 1.      Waiver

As an initial matter, the court must determine whether this issue is properly before the court when Mitchell failed to specifically raise it in her opening brief.  Ordinarily, an issue is waived when the plaintiff fails to specifically raise it in her merits brief.  *See Swain v. Comm'r of Soc. Sec.*, 379 F. App'x 512, 517 (6th Cir. 2010) (affirming a district court's finding that a claimant waived arguments that he did not raise in his merits brief).  This rule is typically applied when an issue is raised for the first time in a reply brief because the opposing party is prejudiced by an inability to respond to the argument.  *Cf. United States v. Jerkins*, 871 F.2d 598, 602 n.3 (6th Cir. 1989) ("'It is impermissible to mention an issue for the first time in a reply brief because the appellee then has no opportunity to respond.' *Knighten v. Comm'r*, 702 F.2d 59, 60 n.1 (5th Cir. 1983).").  The other rationale behind waiver is that an insufficiently developed argument improperly asks the court to develop it on behalf of the parties.  *Cf. McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("'Issues adverted to in a perfunctory manner,

unaccompanied by some effort at developed argumentation, are deemed waived.  It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.' *Citizens Awareness Network, Inc. v. United States Nuclear Regulatory Comm'n*, 59 F.3d 284, 293-94 (1st Cir. 1995).").

But when the Commissioner *does not raise the issue of waiver* and instead fully briefs an issue not raised in the plaintiff's opening brief, it would offend reason to say that the Commissioner was prejudiced by an inability to respond to the matter.  *Cf. Creager v. Colvin*, No. 12-cv-12852, 2013 U.S. Dist. LEXIS 121387, at *28-29 (E.D. Mich., Jun. 21, 2013) (Commissioner was "sufficiently on notice" of a Sentence Six remand argument not specifically raised in a plaintiff's initial brief when the Commissioner did not raise the issue of waiver and fully briefed the argument); *Lemmens v. Astrue*, No. 06-C-473-C, 2007 U.S. Dist. LEXIS 32909, at *10-12 (W.D. Wis., May 3, 2007) (same).  Moreover, it is only natural that a plaintiff be permitted to respond to arguments raised in the Commissioner's response brief.  *Cf. Bender v. Comm'r of Soc. Sec.*, No. 11-cv-1546, 2012 U.S. Dist. LEXIS 128114, at *26 (N.D. Ohio, Aug. 17, 2012) ("A reply brief provides a plaintiff the opportunity to respond to arguments raised for the first time in a defendant's brief.").

Here, the Commissioner raised the freestanding issue of whether the ALJ erred by not considering Mitchell's bipolar diagnosis in assessing her RFC in his response brief without asserting that the issue was waived.  ECF Doc. 13 at 6-8.  And by doing so, the Commissioner arguably waived any argument that the issue was waived.  *See Kilroy v. Husted*, 868 F. Supp. 2d 652, 657 n.1 (S.D. Ohio, Apr. 16, 2012) ("In the same way that a movant's argument raised for the first time in a reply brief . . . is waived, a nonmovant's argument is similarly waived by failing to raise it . . ."), *rev'd on other grounds by*, No. 12-3590, 2012 U.S. App. LEXIS 26920 (6th Cir. 2012) (case became moot during appeal).  Moreover, Mitchell responded fully to the

Commissioner's freestanding RFC argument in her reply brief, leaving the matter adequately developed for review.  ECF Doc. 14 at 1-2; *but cf. McPherson*, 125 F.3d at 995-96. Accordingly, Mitchell has not waived this issue.[6]

### 2.    Merits

At Step Four of the sequential analysis, the ALJ must determine a claimant's RFC by considering all relevant medical and other evidence.  20 C.F.R. §§ 404.1520(e), 416.920(e).  The RFC is an assessment of a claimant's ability to do work despite her impairments.  *Walton v. Astrue*, 773 F. Supp. 2d 742, 747 (N.D. Ohio 2011) (citing 20 C.F.R. § 404.1545(a)(1) and SSR 96-8p, 1996 SSR LEXIS 5 (July 2, 1996)).  In assessing, RFC, the ALJ must "consider all of [the claimant's] medically determinable impairments of which [the ALJ is] aware, including [the claimant's] medically determinable impairments that are not 'severe.'"  20 C.F.R. §§ 404.1545(a)(2), 416.945(a)(2); *see also* SSR 96-8p, 1996 SSR LEXIS 5.  A "medically determinable impairment" is an impairment "established by objective medical evidence from an acceptable medical source" using "medically acceptable clinical and laboratory diagnostic techniques."  20 C.F.R. §§ 404.15921, 416.921 (noting that a claimant's statements concerning symptoms, a diagnosis, or a medical opinion are insufficient).  Relevant evidence includes a claimant's medical history, medical signs, laboratory findings, and statements about how the symptoms affect the claimant.  20 C.F.R. §§ 404.1529(a), 416.929(a); *see also* SSR 96-8p, 1996 SSR LEXIS 5.

---

[6] The Commissioner raised another issue that did not appear in Mitchell's initial brief: whether the ALJ properly gave "little weight" to Nurse Corell's opinion.  *Compare* ECF Doc. 13 at 12-14, *with* ECF Doc. 11 at 17-18 (discussing Nurse Corell's opinion only in asserting that Ott's opinion was consistent with other evidence).  But Mitchell's reply brief did not include an argument that the ALJ erred in giving Nurse Corell's opinion "little weight."  *See generally* ECF Doc. 14.  Thus, the issue is waived.  *Cf. Swain*, 379 F. App'x at 517.

The ALJ failed to apply proper legal standards in evaluating Mitchell's RFC when he failed to consider her bipolar disorder.  42 U.S.C. §§ 405(g), 1383(c)(3); *Rogers*, 486 F.3d at 241.  Dr. Bhandari's multiple treatment notes recited that Mitchell was diagnosed with bipolar disorder; and in April 2017, Dr. Bhandari expressly assessed that the "diagnosis appears to be Bipolar DS Depressed."  (Tr. 1136, 1144-47, 1150-53, 1249-51, 1262-89, 1292, 1294).  And Mitchell, at the ALJ hearing, testified that she was bipolar (Tr. 510).  Still, the ALJ never mentioned Mitchell's bipolar diagnosis in his written decision.  *See generally* (Tr. 15-31).  This is insufficient to satisfy the regulations' requirement that an ALJ consider *all* of a claimant's impairments in assessing her RFC, and it is patently insufficient to provide Mitchell and this court with a clear understanding of the ALJ's rationale.  20 C.F.R. §§ 404.1545(a)(2), 416.945(a)(2); *see also* SSR 96-8p, 1996 SSR LEXIS 5; *see, e.g.*, *Potts-Shipley v. Colvin*, No. 3:12-cv-406, 2013 U.S. Dist. LEXIS 158358, at *21-23 (S.D. Ohio, Nov. 5, 2013) (ALJ's "total failure" to provide any indication that she considered a plaintiff's bipolar disorder and panic disorder at any point in her sequential evaluation resulted in an insufficient explanation for review).  Indeed, the failure to even once mention Mitchell's bipolar disorder precluded the ALJ from building "an accurate and logical bridge between the evidence and the result."  *Fleischer*, 774 F. Supp. 2d at 877.

The Commissioner's attempt to salvage the ALJ's total failure to indicate whether he considered Mitchell's bipolar disorder by asserting that it was based on objective clinical findings – *i.e.*, that Mitchell's bipolar disorder was not a medically determinable impairment under 20 C.F.R. §§ 404.15921, 416.921 – is unavailing.  Although it is true that the ALJ might have been relieved from considering Mitchell's bipolar disorder in determining her RFC if it were not a medically determinable impairment, there is no indication in the record that the ALJ found that her bipolar disorder was not a medically determinable impairment.  *See Rouse v.*

37

*Comm'r of Soc. Sec.*, No. 2:16-cv-223, 2017 U.S. Dist. LEXIS 6172, at *11 (S.D. Ohio, Jan. 17, 2017) ("[A] claimed condition which is not 'medically determinable' need not be considered at all."); *see generally* (Tr. 15-31). And if the court were to adopt the Commissioner's argument that Mitchell's bipolar disorder was not a "medically determinable impairment" we would be endorsing an improper post-hoc rationalization. *See Williams v. Comm'r of Soc. Sec.*, 227 F. App'x 463, 464 (6th Cir. 2007) (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947) (holding that a reviewing court, in assessing the decision of an administrative agency, must judge its propriety solely by the grounds invoked by the agency)).

Thus, I recommend that the Court decline to decide whether Mitchell's bipolar disorder was a "medically determinable impairment," and remand the case for the ALJ to make that decision in the first instance. *See, e.g., Mays v. Comm'r of Soc. Sec.*, No. 1:14-cv-647, 2015 U.S. Dist. LEXIS 105538, at *16-18 (S.D. Ohio, Aug. 11, 2015) (remanding for an ALJ to determine whether a claimant's major depressive disorder was a "medically determinable impairment" and caused functional limitations "because it is not [the] Court's role to reweigh the evidence").

Upon remand, the ALJ might determine that Mitchell's bipolar disorder was not a medically determinable impairment. But he might determine that it was. And, if the ALJ determines that it was a medically determinable impairment, then he must determine whether it caused any functional limitations beyond those already considered in formulating Mitchell's RFC. If he finds that it did not cause additional limitations, the Commissioner will likely reach the same conclusion that the ALJ expressed here. Then again if he finds that there were additional functional limitations the RFC would have to be reevaluated. It is not the province of this court to make these judgments.

## VII.    Recommendation

Because the ALJ failed to apply proper legal standards and build an adequate and logical bridge between the evidence and the result when he failed to consider – or even indicate whether he considered – Mitchell's bipolar disorder in assessing her RFC, I recommend that the Commissioner's final decision denying Mitchell's applications for SSI and DIB be VACATED and that Mitchell's case be REMANDED for further consideration in light of this Report & Recommendation, should the Court adopt the same.

Dated: March 12, 2020

Thomas M. Parker
United States Magistrate Judge

_____

### OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn,* 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986).